714 So.2d 1027 (1998)
Thomas John WOODWARD, a/k/a Tom Jones, Appellant,
v.
Katherine BERKERY, Appellee.
Thomas John WOODWARD, a/k/a Tom Jones, Petitioner,
v.
The MIAMI HERALD PUBLISHING CO., and Katherine Berkery, Respondents.
Nos. 97-0398, 96-2483.
District Court of Appeal of Florida, Fourth District.
February 4, 1998.
*1029 Edna L. Caruso of Caruso, Burlington, Bohn & Compiani, P.A., West Palm Beach, and Andrew S. Berman of Young, Berman & Karpf, P.A., North Miami Beach, for appellant-petitioner.
Howard I. Weiss and David K. Friedman of Weiss & Handler, P.A., Boca Raton, for appellee-respondent Berkery.
Jerold I. Budney, Miami, for respondent Miami Herald Publishing Co.

CORRECTED OPINION
FARMER, Judge.
It's not unusual for a parent with custody of a young child to seek an increase in child support from the other parent; awards of interim attorney's fees in such cases are commonplaceas are disputes over discovery of finances and income. What makes today's cases unusual, however, is that the interim fees awarded and the discovery allowed raise substantial questions as to the rightful scope of both in modification proceedings where the prior judgment was based on an agreement between the parties.
These cases arise from an action to modify New York judgments determining paternity and fixing the amount of support. The mother seeks to domesticate the New York judgments as a predicate to having a Florida court increase the amount of support due. That in turn raises its own questions as to the proper role of a new forum in modifying consent judgments relating to child support. On our own motion, we consolidate the cases and undertake to decide the issues together.

I. Background and Facts
Because context is everything, we first set the stage. The father is the well-known singer and entertainer, Tom Jones. He and the mother met after one of his concerts. After a relationship spanning a single encounter, they conceived the child who is the subject of this dispute.[1] In 1988 the mother gave birth to a baby boy and thereafter brought a paternity action against Jones in a New York court. That court adjudicated Jones as the father.
While the paternity adjudication was on appeal, the parties settled the case in 1989. Jones agreed to annual child support of $33,500 payable monthly, as well as lump sum payments of $37,433 for the mother's expenses and $59,000 for her attorney's fees. He also agreed to maintain a hospital and major medical benefit package (health benefits) for the child equivalent to the kind he provides to one of his own employees, but she would be responsible for all the child's *1030 medical expenses not covered by insurance. Finally, he agreed that he would pay all the costs of a private education for the boy, including tuition not less than that charged at the most expensive Ivy League universities.
The agreement was subject to approval by a New York state agency and ultimately by the New York court itself. These approvals were sought under a New York statute that allowed the enforcement of nonmodifiable child support stipulations between consenting parents, subject to the approval of the court. The New York court approved this initial settlement agreement in 1989. That is the first of the two New York judgments sought to be modified by the present action.
In 1992 the parents entered into a new agreement modifying their original agreement, whereby the mother released Jones from any further payment of health benefits in exchange for a one-time payment of $40,000. The New York court also approved this later agreement and modified the original child support judgment accordingly. That is the second New York judgment sought to be domesticated in the present action.
It appears that the child resided in Florida when the mother sued Jones in New York for paternity and support. Having agreed with Jones in New York to a nonmodifiable amount of support, which was approved by the New York court, she nevertheless commenced this action in the Circuit Court in Broward County in 1996 to domesticate the New York judgments as a basis for seeking to modify them to increase the amount of support due and to reinstate the obligation to pay health benefits. Although he is not a resident of Florida, she served him with process while he was in this state in performance at a concert.[2] Shortly after this point the two appellate cases were filed in this court.

II. Nonfinal Appeal and Attorney's Fees
After commencement of her modification action, the mother filed a motion seeking temporary or interim attorney's fees, costs, and suit money under section 61.16.[3] The then assigned trial judge held a lengthy evidentiary hearing that stretched for more than four days. At the conclusion, Judge Rosenberg entered a 48-page order in which he ordered the father to pay the following sums in interim attorney's fees and suit money: (1) $71,489 for fees already incurred; (2) $65,800 for projected fees; (3) $4,533 in suit money for expenses already incurred; and (4) $52,052 in projected suit money.[4] In short, the judge found $137,289 in interim court-awarded attorney's fees to be reasonable. Actually, however, Judge Rosenberg's order finds that the father had already made a priorpurely voluntarypayment of $20,000 in fees to the mother's counsel, so we are really talking about $157,289 in total interim attorney's fees for the mother's counsel. Moreover, his order stresses that "the projected attorney's fees and suit money are interim only, and other periodic payments may be necessary," citing our decision in Robbie v. Robbie, 591 So.2d 1006, 1010-11 (Fla. 4th DCA 1991).[5]
*1031 We recognize that the trial judge has broad discretion in setting interim awards of attorney's fees and suit money in family law cases. Robbie, 591 So.2d at 1008. That discretion does not exist in the abstract, however, but is instead a discrimination informed by legal principles. The supreme court has recently held in Rosen v. Rosen, 696 So.2d 697 (Fla.1997), that Robbie and other cases are incorrect in holding that attorney's fees under section 61.16 are limited to consideration of the factors of the need of the party seeking such fees and the ability of the party from whom the fees are sought. As the court has now made clear in Rosen:
"Under [section 61.16], the financial resources of the parties are the primary factor to be considered. However, other relevant circumstances to be considered include factors such as the scope and history of the litigation; the duration of the litigation; the merits of the respective positions; whether the litigation is brought or maintained primarily to harass (or whether a defense is raised mainly to frustrate or stall); and the existence and course of prior or pending litigation. Had the legislature intended to limit consideration to the financial resources of the parties, the legislature easily could have said so."
696 So.2d at 700. The court has further explained that:
"section 61.16 should be liberallynot restrictivelyconstrued to allow consideration of any factor necessary to provide justice and ensure equity between the parties."
Id.
In this case, it is clear that the trial judge below based his determination of fees solely on the financial resources of the parties and failed to consider whether under the applicable equitable considerations explained in Rosen any award of fees would be proper in light of the peculiar circumstances.[6] In a post settlement, post judgment case such as this, the factors identified in Rosen, other than the financial resources of the parties, assume even greater importance in the decision to award interim fees. In domestic relations cases seeking to modify or set aside a settlement, one factor the trial court should consider in deciding whether to award interim fees is the need to impose some "economic rationality" on the party initiating the post judgment litigation. See Oldham v. Oldham, 683 So.2d 579, 582 (Fla. 4th DCA 1996) (Polen, J., concurring). We therefore find it necessary to reverse the present fee award for just such a consideration.
In light of the special deference owed to final judgments whether rendered by a court of this state or another, on remand it will be necessary for the trial court first to assess the precise nature of the dispute to be litigated before it can proceed to determine whether an interim award of additional fees beyond what Jones has already paid voluntarily is necessary or proper. This is, after all, not a plenary proceeding to establish paternity and fix the amount of support for the first time. It is instead an attempt by the custodial parent to modify a support judgment entered by a court in another state. Moreover, we stress, the New York judgments were entered upon agreements of the mother and father respecting the support obligations. Neither the agreements themselves, nor the judgments ratifying and enforcing these agreements, should be lightly disregarded in a modification proceeding brought in this state.
Indeed, Jones argues that the Full Faith and Credit Clause of the United States Constitution[7] limits the authority of a Florida court to modify nonmodifiable child support set by a New York court in the absence of some demonstrable need of the child not being met by the current judgment amountwhich, he says, the mother has not alleged. As we recently pointed out in Kramer v. Kramer, 698 So.2d 894 (Fla. 4th DCA 1997), Congress has adopted specific legislation under this constitutional provision *1032 relating to child support orders, the Full Faith and Credit for Child Support Orders Act, Pub.L.No. 103-383, § 3(a), 108 Stat. 4064, 28 U.S.C. § 1738B (1996). In passing this new legislation, Congress took specific note of conflicting state laws as to the determination and enforcement of child support obligations, which in turn had led to "excessive relitigation of cases and conflicting orders by the courts of various jurisdictions." See Pub.L.No. 103-383, § 2, 108 Stat. 4064.
The Act contains explicit provisions relating to modification of child support orders rendered by another state. Section 1738B(e) permits a state court to modify a child support order validly entered by the court of another state only when two conditions are satisfied. First, the issuing court must have lost exclusive jurisdiction either because neither the child nor any parent continues to reside there, or instead because each of the parents has filed a written statement with the issuing court consenting to modification in another state. See 28 U.S.C. § 1738B(e)(2)(A) and (B). Second, the modification proceeding must be filed in a state having personal jurisdiction over the nonmoving parent. Id. at § 1738B(i). Those parts of the record below furnished us by the parties are insufficient for us to determine that either of these conditions have been met in this case, and consequently we are unable to decide from the face of the limited record we have whether Florida has the authority under section 1738B(e) to enter a modification order binding Jones.[8]
In order to reach the question whether interim fees for a modification attempt should be considered, the court will first have to determine whether and to what extent any modification may be had in Florida. That, in turn, will require the court to determine whether New York law will control the substantive legal issue of the propriety of modification. To the extent that the settlement agreements purport to be the exclusive source of the mother's future support rights against Jones, her attempt to modify the agreements on account of an alleged change in his income may be an interpretation of the New York orders requiring application of New York law under section 1738B(h)(2). These determinations are required in order to assess what contested issues might be legitimately resolved in a modification attempt here.
As we previously indicated, we agree with the mother that the court has broad discretion in setting interim attorney's fees in family law matters under section 61.16. We repeat, however, that it is nevertheless a discretion related to a determination of a legally sustainable controversy, properly raised in a Florida court. It is not a generalized discretion allowing the trial judge in every case to award an amount that might generally be incurred in litigating a fully contested divorce or paternity case. In this instance, the actual controversy is singular and discrete, involving not so much a factual dispute, but is instead concentrated on a limited legal issue. Again the threshold issue is whether modification can be sought in Florida and, if so, to what extent the New York orders are modifiable by a Florida court in light of the agreements on which they were based and the apparent absence of any allegation of a substantial change in the circumstances under which they were made. It is only when these matters are settled that the trial court will be in a position to confront all the equitable considerations that Rosen requires for attorney's fees under section 61.16.

III. Certiorari and Discovery
This leads us to the petition for certiorari, for it confronts the scope of discovery in this modification proceeding. First we delineate the procedural events bringing us the issue. The mother has filed a financial affidavit showing that she has no income other than what Jones pays her in child support under the New York judgments.[9] She has served *1033 the father with the standard, broad discovery requests generally applicable in routine family law matters. Among other things, she seeks information and documentation from him as to all sources of his income, including fees from his performances, royalties, investments, and the like, for him individually as well as from companies in which he may have some interest. She also seeks detailed information and documents evidencing the entire range of his investments, assets and liabilities.
Jones timely responded to the action and objected to the requested discovery. The trial court overruled his blanket objection to any discovery and ordered him to file a financial affidavit as required by rule 12.285(d)[10] and to respond to those interrogatories and document requests he felt were proper, stating specific objections to those thought improper. He then filed a financial affidavit asserting that he has $89,000 in net monthly income. At the same time, he filed a motion for a protective order asking that his discovery responses be kept confidential.[11] At that point, The Miami Herald sought to intervene in the action below to oppose the protective order. Ultimately, the trial court overruled all of his objections and denied any protective order for confidentiality, telling him that he could renew the motion as to any specific discovery as to which he could show some special reason. This petition seeks review of the trial court's denial of these requests.
As to Jones's motion for a protective order against financial discovery beyond the financial affidavit, the trial court relied on the recently adopted Family Law Rules of Proceduremore specifically rule 12.285.[12] Subdivision (d)(3) of rule 12.285 appears to make some financial discovery mandatory in all cases.[13] Rule 12.285(a)(1), however, provides that "[e]xcept for the provisions as to financial affidavits, any portion of this rule may be modified by order of the court or agreement of the parties."[14] In spite of that language, the trial court felt that it had no power to relieve Jones of the burden of responding to the additional discovery sought by the mother. In this we think the trial court has departed from the essential requirements of the law. Its error was compounded by its blanket refusal to restrain the mother and her counsel from disclosing all of Jones's financial information to the presswhich they repeatedly have assured Jones and the court that they fully intend to do.
First, we do not read the mandatory disclosure rule to preclude the trial judge from dispensing with discovery beyond the required financial affidavit in a given case. Rather we read the provisions of subdivisions (b), (c), and (d) of rule 12.285 to be self-executing but not necessarily applicable in all cases. In other words, we think that these particular provisions were so framed as to eliminate the necessity to make a formal request for this discovery and, instead, to make it the responsibility of both parties in a family law case to produce the information without such a request. As the Commentary to the rule states:
"This rule creates a procedure for automatic financial disclosure in family law cases. By requiring production at an early stage in the proceedings, it is hope that the expense of litigation will be minimized.... Additionally, the court may, on the motion of a party or on its own motion, limit the disclosure requirements in this rule should it find good cause for doing so."[15] *1034 Thus the automatic discovery established by the rule is subject to being limited or curtailed by the trial court if there is some reason for doing so.[16]
Indeed good reasons appear in this particular case for the trial judge to limit the standard discovery. This is not an action in which the entire range of financial issues attendant to a dissolution of marriage or paternity case, just getting under way, is to be litigated.[17] Moreover she does not allege any unusual changessuch as health or physical impairment of the child arising since the New York decreesor that the needs of the child have substantially changed in some way not contemplated when the agreements were approved by the court in New York. Rather, the mother seeks to avoid these agreements with Jones and instead to compel payments greater than she bargained for. As a basis for the modification she alleges merely that Jones has lately enjoyed a resurgence in his career, thereby giving rise to a "good fortune" modification under Florida law, and that the child has grown since the entry of the New York judgments.
The argument raised by Jones below was that the unique nature of the mother's claims should result in a substantial narrowing of discovery. The mere fact that Florida may acquire judicial jurisdiction to consider a modification of child supportif, indeed, that is the case heredoes not inevitably mean that the Florida court should proceed to reconsider the matter de novo when, as here, final decrees in another state have approved an express agreement fixing support and there has not been alleged any substantial change unforeseen by the parties. Even assuming that full faith and credit for the New York judgments would allow any modification at all, he argues that no permissible change in the support amount would entail the kind of broad, generalized discovery that the trial court has allowed to take place. Moreover, he urges that the power of a Florida court to force him to respond with financial worth information in order for her to make her claim does not allow her to use this compulsory discovery process to make his private finances available to the world. He contends that the fact that the court may force him to disclose this information to her in pretrial proceedings should not deprive the court of the power to protect the compelled disclosure of this information to persons outside of those to whom disclosure is necessary in the action.
In Martin-Johnson Inc. v. Savage, 509 So.2d 1097 (Fla.1987), the court held that ordinarily an order allowing financial worth discovery did not by itself present the kind of irreparable harm necessary for review by common law certiorari. There the discovery was requested in connection with a claim for punitive damages where there had yet been no indication that the issue of punitive damages would actually be submitted to the jury. The court explained that "[i]n certiorari proceedings, an order may be quashed only for certain fundamental errors." 509 So.2d at 1099. In deciding that discovery of a litigant's finances by itself was generally not the type of harm contemplated by certiorari review, the court relied to a great extent on Kilgore v. Bird, 149 Fla. 570, 6 So.2d 541 (1942). Because Kilgore apparently provides some insight to ascertain when common law certiorari is available to review discovery orders, we now turn to it.
Kilgore was a common law certiorari proceeding confronting an order allowing answers to interrogatories in an action for damages from an alleged alienation of affections. Many of the questions were so framed as to violate the rules of evidence, while others appeared, in the words of the court, to violate the civil rights of the party to whom they were propounded. The court said:

*1035 "In ruling on objections to interrogatories, the rules of admissibility of evidence are controlling and should be applied. A question which elicits an answer not material to the issues should not be allowed. A question requiring an answer which would violate the civil rights of the witness should be prohibited, because if such right is violated the wrong cannot be righted. It, therefore, follows that requiring a witness to answer some questions may constitute error which may or may not warrant reversal on appeal and inflict no injury on the witness, while requiring the witness to answer other questions might so violate his civil rights as to make review on appeal entirely inadequate and would constitute such a departure from the essential requirements of the law as to make a ruling requiring the answer reviewable on certiorari to adequately protect the constitutional or lawful rights of the witness." [e.s.]
6 So.2d at 545. In Kilgore, the court was actually unable to reach the substantive issues and returned the case to the trial court.
Martin-Johnson stated that disclosure of personal financial information was not alone sufficient to establish irreparable harm for common law certiorari. See also Eberhardt v. Eberhardt, 666 So.2d 1024 (Fla. 4th DCA 1996) (production of income tax returns in action for accounting indistinguishable from financial worth information sought in Martin-Johnson; mere production of financial worth without more insufficient to show irreparable harm). Hence irreparable harm in the present discovery order is indispensable to enable us to review it by common law certiorari. See Bared & Co. v. McGuire, 670 So.2d 153 (Fla. 4th DCA 1996). The kind of discovery that might cause injury of an irreparable nature was illustrated by "cat out of the bag" information. The court defined such a disclosure as "material that could be used by an unscrupulous litigant to injure another person or party outside the context of the litigation." 509 So.2d at 1100.
We must decide whether Jones has established the kind of irreparable injury contemplated by the court in Kilgore and Martin-Johnson. The discovery of financial worth information that is not material to any issue reasonably likely to be contested and equally importantthat has been sought primarily to embarrass and bring undue pressure on a litigant through unwarranted publicity by disclosure of sensitive personal financial information to the press would be incurable by any possible action we could take on final appeal from an order modifying the child support. Without a protective order, irrelevant details of Jones's financial holdings that he has apparently guarded assiduously from disclosure to the press would be disclosed through the mother to the Miami Herald and thence beyond recall. Moreover the revelation would have resulted from a fundamentally erroneous legal interpretation of the discovery rules that would inevitably evade review until long after the disclosure had been made.
The constitution of the State of Florida contains an express right of privacy.[18] Although there is no catalogue in our constitutional provision as to those matters encompassed by the term privacy, it seems apparent to us that personal finances are among those private matters kept secret by most people. See Winfield v. Division of Pari-Mutuel Wagering, 477 So.2d 544 (Fla. 1985) (law in Florida recognizes an individual's legitimate expectation of privacy in individual's private bank account, financial records). Disclosure of income and personal investments is often not made even to siblings and others within the immediate family, much less to strangers. Private financial worth information is thus usually withheld from the world at large unless the courts compel such disclosure. Even then, disclosure is made only so far as necessary.
We note that Jones's financial affidavit discloses that his net monthly income is at least $89,000, or more than $1 million on an annual basis. This admission by Jones raises a serious question in the context of this case whether any additional financial worth discovery from him is legally relevant and *1036 reasonably calculated to lead to admissible evidence on any contested issue actually cognizable in this modification of the New York decrees. As we have seen earlier, under the Family Law Rules, disclosure of personal financial worth is required unless excused by the trial judge. Thus the state compels disclosure of information that one would be expected to keep private because it is necessary to enable the system for child support to function. On the other hand, the constitutional right of privacy undoubtedly expresses a policy that compelled disclosure through discovery be limited to that which is necessary for a court to determine contested issues of support. See Winfield, 477 So.2d at 547 (right of privacy is fundamental right, requiring a compelling state interest to justify an intrusion on privacy, but then only by the least drastic means). The rules relating to family law cases contemplate some privacy interests in such proceedings, for they expressly address sealing of court records in these cases. See Fla.Fam.L.R.P. 12.280(c) ("A determination as to the confidentiality of a court record shall be made in accordance with Florida Rule of Judicial Administration 2.051.") and 12.280(d) ("Records found to be confidential under Florida Rule of Judicial Administration 2.051 shall be sealed on request of a party.").[19]
In this case, the claim of confidentiality asserted by Jones relates to his responses to discovery compelled by the applicable rules of procedure. The responses to such discovery are not filed directly in the court file before a trial or hearing unless there is some special need to do so. See, e.g., Fla.R.Civ.P. 1.340(e) ("The original or any copy of the answers to interrogatories may be filed by any party when the court should consider the answers to interrogatories in determining any matter pending before the court."); and Fla.R.Civ.P. 1.350(d) ("Unless required by the court, a party shall not file any of the documents or things produced with the response. Documents or things may be filed when they should be considered by the court in determining a matter pending before the court.").[20] At this point, the discovery is not yet evidence in the case. In fact it may never become evidence formally admitted in any court hearing or trial. It is merely information from which admissible evidence may be found and ultimately adduced.
The scope of discovery in a modification proceeding is necessarily narrower than in a plenary proceeding to establish the need and amount of such support in the first instance. Where there has been no prior adjudication of the support issue, as for example when a dissolution of marriage or paternity case is first filed, it is usually necessary to require broad disclosure by both parties to provide a trial judge with an evidentiary basis to decide contested issues as to support. When, as here, the issue is modification of prior adjudications of support, however, the necessity for discovery is decidedly different. The prior adjudications must necessarily be understood to have been made on a record of known facts about financial worth. Thus assuming that a Florida court has the authority to modify another state's support order, any new discovery should properly be limited to the precise change in circumstances properly alleged and cognizable in the requested modification. In this case, however, the trial judge did not engage in the kind of analysis just outlined as to the permissible scope of discovery.
We conclude that the failure to analyze the need for the requested discovery under the unique circumstance of this case was a departure from the essential requirements of law which if uncorrected will lead to the kind of irreparable harm contemplated by Martin-Johnson. There are at least two identifiable circumstances compelling this extraordinary review to set a limit on *1037 the extent of discovery and to protect against unwarranted disclosure. First, Jones's financial worth affidavit demonstrates an undeniable ability, without knowing anything further about his finances, to pay any possible reasonable increase in support that changed circumstances of the child could now require. As we noted earlier, he admits to having net disposable income of more than $1 million annually for support purposes. That disclosure raises substantial doubts in our minds as to the necessity for further discovery as to his financial worth, even if (for the sake of argument) the contested issue for modification purposes was in his ability to pay additional support.[21]
We again stress that the very narrow range of issues possible in this proceeding should yield a corresponding narrowing of discovery. Generally, the broad standard for discovery is that the information sought be relevant, admissible evidence, or be reasonably calculated to lead to admissible evidence. See Fla.R.Civ.P. 1.280(b)(1) (discovery required to be relevant to the subject matter of the pending action); Allstate Ins. Co. v. Langston, 655 So.2d 91 (Fla.1995) (discovery in civil cases must be relevant to the subject matter of the case and must be admissible or reasonably calculated to lead to admissible evidence); Amente v. Newman, 653 So.2d 1030 (Fla.1995) (concept of relevancy is broader in discovery context than in trial context, and party may be permitted to discover relevant evidence that would be inadmissible at trial if it may lead to discovery of relevant evidence). Even the possibility of unearthing some admissible evidence from routine discovery responses is constrained by a proper limitation of the discovery to the range of the permissible issues to be litigated.
The mother's discovery request is bottomed on the dictum of the supreme court in Miller v. Schou, 616 So.2d 436, 438 (Fla.1993) (under Florida law, child of a multimillionaire would be entitled to share in standard of living of wealthy parentfor example to attend private school or to participate in expensive extracurricular activitiesand would accordingly be entitled to a greater award of child support to provide for these items, even though provision for such items would not be ordered in a different case); but see Finley v. Scott, 687 So.2d 338 (Fla. 5th DCA), rev. granted, 697 So.2d 510 (Fla.1997) (father could not be required, regardless of his ability to pay more than was necessary to meet the child's current need for support, to contribute to fund for child's unspecified future needs in order for child to share in father's "good fortune").[22] Yet the mother's request to modify support arises from her attempt to relocate this litigation outside of the jurisdiction fixing the support to a new jurisdiction that may employ different standards in setting support in the first instance. Thus, even if Florida has jurisdiction to modify support, there seems little if any justification for allowing discovery as to his financial worth.
Second, and indispensable to our conclusion of irreparable harm, the mother has frankly made clear her purpose to release to the press any financial worth information she acquires from Jones during discovery.[23] At *1038 the same time, the Miami Herald has made equally clear its purpose to publish this information. We stress that we are considering financial worth information that is exchanged in discovery and that may never be used as evidence in any trial or evidentiary proceeding. While financial worth may be critically important to enable a trial court to ascertain the base line of financial worth in a plenary proceeding for dissolution of marriage or paternity and thus to fix the original amount of child support, there is nothing in the Family Law Rules suggesting that one of its purposes is to facilitate disclosure to the press during discovery of such sensitive information. The fact that the State of Florida may not inhibit the freedom of the press to publish information it deems newsworthy does not mean that the instruments of the civil justice system of the State of Florida should be used simply to assist in the disclosure and publication of such information in the media.
Moreover, as we have seen, the Family Law Rules and Rules of Judicial Administration contemplate claims of confidentiality as to discovery information. Inexplicably, the trial judge here denied the motion for a protective order without addressing these issues at all. Indeed, the trial judge's ruling allows disclosure through the Miami Herald to the world at large of information apparently protected by a right of privacy before any determination of confidentiality and sealing has been made. We regard this as the kind of extraordinary harm, irremediable on final appeal, that lies within our certiorari jurisdiction.
We also repeat that under the circumstances of this case any claim to modification must begin with an abundant deference to the full faith and credit requirements of the recent federal legislation. The first order of business is to address Florida's claim to jurisdiction over the modification issue under section 1738B(i). Even if Florida has such jurisdiction, the court will still want to accord sufficient respect to the prior agreements made by the mother. The mere fact that Florida may have jurisdiction to modify support does not alone justify canceling agreements solemnly made in another state and approved by a court there, simply because they concern child support different from that which a Florida court might have set in the beginning. It is against this background of legal framework that the trial court must assess the necessity for any additional discovery. We leave that to the trial judge in the first instance on remand.
We therefore reverse the interim award of attorney's fees. At the same time we quash the discovery orders, and remand the case to the trial court for proceedings not inconsistent with the views we have expressed today.
SHAHOOD and GROSS, JJ., concur.
NOTES
[1] He and the mother have never married or cohabited.
[2] Jones has not raised any issue on appeal as to the personal jurisdiction of the Florida court over him with respect to his obligation of child support. But see § 48.193(1)(e), Fla. Stat. (1995) (defining matrimonial domicile or residence in Florida as basis for long-arm jurisdiction over nonresidents in proceedings for child support).
[3] § 61.16(1), Fla. Stat. (1995) ("The court may from time to time, after considering the financial resources of both parties, order a party to pay a reasonable amount for attorney's fees, suit money, and the cost to the other party of maintaining or defending any proceeding under this chapter, including enforcement and modification proceedings and appeals.").
[4] The suit money appears to be earmarked for expert witnesses, principally accountants.
[5] Judge Greene's stay order directs the father to make immediate payment of $90,882 to the mother's counsel, who in turn is required to execute an affidavit agreeing to reimburse the father upon receipt of our mandate for any amount determined not to have been validly earned. As to the remainder of the total interim award, the stay is conditioned on the father furnishing a bond in the amount of $123,590. If mother's counsel does not execute the affidavit of reimbursement, then the total bond is $232,649. Judge Greene's stay order further indicates a willingness to allow mother's counsel to invade any sums deposited with it pending the appeal.
[6] Rosen was, of course, decided after Judge Rosenberg entered his order awarding interim fees, and thus he did not have the benefit of the supreme court's decision.
[7] See Art. IV, § 1, U.S. Const. ("Full Faith and Credit shall be given in each State to the ... judicial Proceedings of every other State.").
[8] There is nothing to tell us whether he continues to be subject to the personal jurisdiction of the New York court or, instead, whether he has consented to modification in Florida. The fact that Jones may now reside in California does little to tell us whether he continues to be subject to the jurisdiction of the New York court.
[9] There is no indication, however, that she is unable to work and earn income on her own.
[10] See Fla.Fam.L.R.P. 12.285(d) (mandatory disclosure for parties whose combined income exceeds $50,000 per annum).
[11] He had previously offered to provide her and her counsel with a financial affidavit if she and counsel would agree to keep the affidavit and his financial information confidential. She and her counsel refused to do so.
[12] Fla.Fam.L.R.P. 12.285(b)(2) ("Any document required under this rule for any initial or supplemental proceeding shall be served on the other party for inspection and copying within 45 days of service of the initial pleading on the respondent.").
[13] Fla.Fam.L.R.P. 12.285(d)(3) ("In any temporary or permanent supplemental proceeding regarding financial relief, documents shall be produced as set forth in subdivision (d)(1) and (d)(2), respectively and shall be served as set forth in subdivision (b).").
[14] Fla.Fam.L.R.P. 12.285(a)(1).
[15] Fla.Fam.L.R.P. 12.285.
[16] Fla.Fam.L.R.P. 12.285(g) ("Objections to the mandatory automatic disclosure required by this rule shall be served in writing at least 5 days prior to the due date for the disclosure or the objections shall be deemed waived. For good cause shown, the court may extend the time for the filing of an objection or permit the filing of an otherwise untimely objection.").
[17] We note that there is no suggestion by the mother that the New York agreements were coerced or fraudulently procured, or that in inducing the agreements Jones misrepresented or understated his income or ability to pay support.
[18] Art. I, § 23, Fla. Const. ("Every natural person has the right to be let alone and free from governmental intrusion into his private life except as otherwise provided herein.").
[19] Florida Rule of Judicial Administration 2.051(c)(9) specifically recognizes and authorizes confidentiality for "[a]ny court record determined to be confidential in case decision or court rule on the grounds that ... (A) confidentiality is required to .... (iv) obtain evidence to determine legal issues in a case; [or] ... (vi) avoid substantial injury to a party by disclosure of matters protected by a common law or privacy right not generally inherent in the specific type of proceeding sought to be closed...."
[20] Both rule 12.340 (Interrogatories) and rule 12.350 (Production of Documents) refer to the applicable Rules of Civil Procedure.
[21] We again emphasize that the real basis for the mother's modification attempt appears to be her attempted relocation of this litigation to Florida where parental support agreements may be treated differently than in New York.
[22] We discern differences between this case and Miller, which involved a modification to establish for the first time precisely what the father's financial resources really were after he had newly entered into the practice of medicine and had thus begun for the first time to earn considerable income. In contrast, the future "good fortune" of Jones must be understood to have been within the contemplation of the contracting parties when they settled the matter with the approval of the New York court. Even assuming for the sake of argument that Miller v. Schou is the applicable lawrecalling, of course, that this is an attempt to modify New York judgmentsthe prospect of more good fortune for Jones is one of the very future contingencies against which Jones's agreement was presumably intended to protect. Thus, the agreements established the standard of living for the child, so discovery as to his "good fortune" in that regard is similarly misplaced.
[23] We view with the same skepticism as did the trial court the attempts of the mother to justify her refusal to keep Jones's financial information confidential by stating that all she wants to do is test the credibility of his finances in a "public arena"by which, she now contends, she meant the courtroom. As we read the context, it is manifest that her intention is to reveal any discovery information to the Miami Herald.